IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| OMAHA PUBLIC POWER DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-115C |
| | ) | (Judge Braden) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S SUPPLEMENTAL BRIEF IN
RESPONSE TO THE COURT'S DECEMBER 22, 2004 ORDER

Pursuant to this Court's order dated December 22, 2004, defendant, the United States, provides this supplement to its prior motion for partial summary judgment relating to the schedule for the acceptance of spent nuclear fuel ("SNF") and/or high-level radioactive waste ("HLW").[1]

## DISCUSSION

### I. PLAINTIFF HAS FAILED TO PROVE ITS BASIC ASSUMPTION THAT DOE WAS OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTUs

#### A. Plaintiff Has Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF

In its cross-motion for summary judgment regarding the rate of SNF acceptance, plaintiff, Omaha Public Power District ("OPPD"), has identified the base assumption upon which all of its damages claims apparently will depend: that DOE was obligated to accept SNF beginning in

[1] As the Court is aware, we also filed a motion for partial summary judgment relating to Greater Than Class C ("GTCC") radioactive waste issues and a motion to dismiss plaintiff's taking claim. We respectfully request that the Court grant both of those motions. Because those motions were not identified in the Court's December 22, 2004 order, we will not further address those motions here.

1998 at an annual rate of 3,000 Metric Tons Uranium ("MTU"), after a short five-year "ramp-up" period. OPPD contends that DOE contractually obligated itself to accept SNF and/or HLW at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that deadline. It asserts that, to meet this goal, DOE would have to accept SNF at a rate of 3,000 MTUs per year, after a short five-year "ramp-up" period. OPPD's basic assumptions are unsupported by either the Standard Contract or the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270.

The evidence is completely contrary to OPPD's assertions that DOE was required to create an acceptance rate that satisfied OPPD's two-part "test." As the Court is aware, DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. 48 Fed. Reg. 5458 (Feb. 4, 1983); see DPFUF ¶¶ 12-19.[2] In response to that proposed rule, several nuclear utilities and industry groups submitted comments, requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at some pre-determined minimum rate, to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan, or to accept SNF "at a rate commensurate with the amount of [SNF] then being generated together with the accumulated backlog of [SNF]." DPFUF ¶¶ 20-25. Although "[a]ll comments received by DOE in response to its proposed rule of

[2] "DPFUF ¶ ___" refers to defendant's proposed findings of uncontroverted fact regarding the rate of spent nuclear fuel acceptance, filed on November 28, 2001. "Resp. to PPFUF ¶ ___" refers to defendant's responses to the plaintiff's proposed findings of uncontroverted fact, filed on April 11, 2003. "Pl. App. __" refers to the appendix to plaintiff's cross-motion for summary judgment regarding the rate of spent nuclear fuel acceptance. "Supp. App. __" refers to the supplemental appendix that accompanies this supplemental brief. "Tr. __" refers to the transcript pages within the supplemental appendix.

February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983), DOE declined to agree to such requests. In the final Standard Contract that it promulgated in the Federal Register, DOE intentionally excluded the creation of any contractual obligations to meet any pre-determined acceptance rate. See DPFUF ¶¶ 41-43; Supp. App. 32 (Tr. 3626:23-3627:13) & 36 (Tr. 3693:23-3695:6); see also Supp. App. 33-35 (Tr. 3635:12-23, 3657:4-12, 3668:1-3).

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery

commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1 (emphasis added). If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE, with a right to appeal to the Energy Board of Contract Appeals if the disagreement cannot be resolved through negotiation. Id., Art. V.B.2 & XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract").

Nothing in those terms creates an obligation upon DOE's part to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the "backlog" of SNF. In fact, OPPD can identify absolutely no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not

incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." 10 C.F.R. § 961.11, Art. XXII.A. OPPD's proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in another SNF case in response to the same argument that OPPD is raising, "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 22 n.12 (Fed. Cl. Jan. 31, 2005) (published opinion).

Further, it is clear that, even if the Court were to accept parol evidence to determine whether the contract contains any such obligation, the nuclear utilities consistently understood that it did not. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is extremely clear in evidencing that DOE did not obligate itself to satisfy OPPD's two-part test and that the nuclear utilities were well aware of that fact. DPFUF ¶¶ 20-25 & 41-43; Supp. App. 32 (Tr. 3626:23-3627:13) & 36 (Tr. 3693:23-3696:8). Further, in other utilities' internal documents from 1983 and 1984, soon after the Standard Contract was executed, those utilities indicated that DOE had not obligated itself in the contract to satisfy a

minimum performance rate, and witnesses from other utilities have previously testified at trial that they understood that DOE had never agreed to satisfy any specific rate of acceptance. Supp. App. 3, 15 (¶ 2), 18 (¶ 2); see Supp. App. 20-23 (May 1983 utility summary of NWPA, not mentioning existence of any requirements for minimum rate at which DOE was required to continue SNF acceptance from utilities after January 31, 1998).[3] Further, in submitting DCSs to DOE in the early 1990s, OPPD did not ever complain that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. DPFUF ¶¶ 106-110. To the contrary, OPPD submitted its DCSs for DOE's approval without ever asserting that the rates that DOE had identified for SNF acceptance were too low. Id. Yet, utilities understood that they were entitled to dispute those allocations, if they so desired. See DPFUF ¶¶ 111; Def. App. 418-28; Supp. App. 4-12. The industry's "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any reading of OPPD's two-part test into the Standard Contract.

---

[3] Although resort to parol evidence is neither necessary nor appropriate in interpreting an unambiguous contract, to the extent that parol evidence is deemed relevant or admissible in interpreting the terms of the Standard Contract, the standardized nature of the contract at issue here requires interpretation of its terms in a uniform manner as applied to all contract holders, not simply OPPD, "without regard to [a particular contract holder's individual] knowledge or understanding of the standard terms of the writing." Restatement (Second) of Contracts § 211 (1981). Accordingly, to the extent that parol evidence is admissible here, review of other contract holders' understandings of the contract requirements is as relevant as a review of OPPD's individual understandings.

### B. OPPD Has Failed To Establish That An Annual Acceptance Rate Of 3,000 MTU Is Necessary To Satisfy The Requirements To Which OPPD Contends DOE Obligated Itself Or That DOE Ever Obligated Itself To Satisfy A 3,000 Rate

Even if OPPD could establish the existence of the two-part requirement (eliminating additional at-reactor storage, and accepting some "backlog"), it has not established that an annual steady-state rate of 3,000 MTU is necessary to satisfy that "requirement." Given that the annual generation rate of SNF is approximately 2,000 MTUs per year, Supp. App. 26 & 29 (Tr. 711:19-22, 1151:3-6), OPPD has identified no reason that an acceptance rate of 2,100 MTUs would not satisfy the alleged two-part requirement that it has identified. Certainly, an annual SNF acceptance rate well below 3,000 MTU could satisfy this two-part requirement. Supp. App. 26 (Tr. 712:16-21). On its face, an acceptance rate anywhere from 2,001 MTUs or above would seem to satisfy that alleged requirement, yet OPPD has presented no evidence to establish the reasons that a 3,000 MTU rate was, in fact, the <u>only</u> acceptable acceptance rate. The absence of this evidence precludes any finding that some annual rate lower than 3,000 MTU would be insufficient to meet this unwritten requirement.

OPPD appears to assert in its cross-motion that the 3,000 MTU rate is somehow mandatory because it has appeared in numerous DOE planning documents. However, the documents upon which OPPD relies to evidence DOE's eventual "intent" annually to accept 3,000 MTUs of SNF generally depend upon the existence of an operational repository. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF <u>either</u> at a repository <u>or</u> at "such other facility(ies) to which [SNF] and/or [HLW] may be

shipped by DOE prior to its transportation to a disposal facility." 10 C.F.R. § 961.11, Art. I.10; see DPFUF ¶¶ 12 & 38. In fact, between the proposed rule and the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983); see DPFUF ¶¶ 12 & 38. As we discussed in prior briefing upon summary judgment, pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, OPPD's reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Further, the planning documents upon which OPPD relies uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. See, e.g., Pl. App. 335 (in 1985 Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses"); Resp. to PPFUF ¶¶ 48-55, 57, 76-79, & 81-82. Each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance

with the contracts, including shipment allocations. Resp. to PPFUF ¶¶ 81, 86, & 94. Although OPPD appears to rely in part upon the 1985 Mission Plan and its drafts to establish DOE's "intent" to accept SNF at a 3,000 annual rate, several commenters, prior to the promulgation of the final Standard Contract, had requested that DOE add a contract provision obligating itself to accept SNF at whatever rates were identified in the Mission Plan. DPFUF ¶¶ 22-23. However, as previously discussed, DOE intentionally declined to create any such obligation. See DPFUF ¶¶ 41-43; Supp. App. 32 (Tr. 3626:23-3627:13) & 36 (Tr. 3693:23-3695:6); see also Supp. App. 33-35 (Tr. 3635:12-23, 3657:4-12, 3668:1-3).[4] OPPD has identified no language in which DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program.

In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In a dispute involving whether the Government had

---

4/ Importantly, the 1985 Mission Plan upon which OPPD relies was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3) After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. OPPD's reliance upon documents prepared for Congress that relate to possible circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

contractually agreed that it would built a right-bank levee, the Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur," which could not constitute a contractual obligation upon the Government's part. Id. at 571, 405 F.2d at 1270; see id. at 570, 575, 405 F.2d at 1269, 1272 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

## II. NOTHING IN THE STANDARD CONTRACT PRECLUDED DOE FROM PERFORMING AT A RATE FAR LESS ONEROUS THAN THAT WHICH OPPD PROPOSES

### A. At Most, The Acceptance Schedule To Which DOE Could Be Held To Perform Could Not Exceed The Rates Contained In The DCSs That DOE Approved

Although OPPD has attempted to impose into the Standard Contract an obligation for DOE to accept 3,000 MTUs of SNF every year soon after 1998, that attempt ignores the actual language of the Standard Contract, which, instead of creating an obligation to accept 3,000 MTU per year, contains a scheduling provision that ultimately allows DOE to select the appropriate SNF acceptance rate, subject only to a review for abuse of discretion by the Energy Board of Contract Appeals ("EBCA"). Under the acceptance mechanism of the Standard Contract, a contract holder had to submit a DCS to DOE for a specific amount of SNF 63 months in advance of the date upon which it wanted DOE to accept that amount of SNF. 10 C.F.R. § 961.11, Art. V.B.1. Under the Standard Contract, if the contract holder did not submit that DCS in a timely manner, the contract holder would not have satisfied the contract prerequisites and requirements for scheduling SNF deliveries and acceptances.

Although OPPD and numerous other contract holders submitted DCSs that DOE approved, OPPD appears to believe that, regardless of those submissions, it had some right to some greater acceptance of SNF beginning in 1998. Yet, OPPD has failed to present any evidence regarding how it, or any other contract holder, would have been able to convince DOE, in 1998, to accept significantly more SNF than that identified in previously approved DCSs. Under its theory of the contract, had DOE begun SNF acceptance in 1998, all of the previously approved DCSs would have been worthless, and DOE would somehow have accepted SNF in

substantially greater quantities than those to which it previously had agreed. In essence, OPPD simply reads the 63-month notice requirement in the acceptance schedule contract provisions out of the contract, in violation of standard contract interpretation principles. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

Under OPPD's theory, DOE will magically know when each contract holder wants SNF accepted, without regard to the DCSs that the contract holders submit; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when each wants acceptance, regardless of space, capacity, staffing, or transportation limitations or notice; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, OPPD has eliminated the only mechanism that would allow the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot function. OPPD's attempts to obtain damages based upon acceptance obligations that far exceed any commitments that DOE made when approving DCSs 63 months before SNF acceptance was to commence are unsupported.

B. Because Of The Manner In Which The Contract's Schedule Provisions Grant DOE The Discretion To Define The Schedule, Any Damages Award Should Be Based Upon The Minimum Schedule That DOE Could Have Selected

OPPD has argued that, because the Standard Contract does not identify a minimum mandatory acceptance rate, the Court's role is to identify a "reasonable" rate for inclusion in the Standard Contract, and OPPD suggests that the 3,000 MTU rate they propose is "reasonable." However, because the Standard Contract does not contain the requirements that OPPD has suggested, the acceptance rates that it has proposed lack any basis. Further, and importantly, because of the manner in which the acceptance schedule mechanism in the Standard Contract is drafted, this Court may not simply identify a rate that it believes "reasonable" and incorporate it into the contract. In light of the manner in which the acceptance schedule contract provisions in this contract were written, DOE can, at best, be held responsible for failing to accept SNF at the least onerous rate at which it could have performed its obligations in accordance with the Standard Contract.

The Standard Contract's schedule terms provide DOE with the option of selecting any one of numerous potential acceptance scenarios, subject only to review by the EBCA for abuse of discretion, the schedule terms act as a form of "alternative contract." "An alternative contract is one in which a party promises to render some one of two or more alternative performances [any] one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts § 1079, at 394 (interim ed. 1979); see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[a]n alternative contract is one wherein A promises B some one of two or more alternative performances"). "A

promise of one of several alternative performances will give the choice of alternatives, unless the contrary is stated, to the person who is to render the performance." 11 W. Jaeger, Williston on Contracts § 1407, at 592 (3d ed. 1968); see 11 A. Corbin, supra, § 1079, at 394 ("[t]he choice among these alternatives, the power of election, is usually given to the promisor"). In such circumstances, "he has power to discharge his contractual duty by performing either alternative." 11 A. Corbin, supra, § 1079, at 394; see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[t]he option may be given to A, in which case he has power to discharge his duty by performing either alternative").

If the promisor breaches its obligations under the alternative contract, the measure of damages is not an amount that the promisee or the Court determines is most attractive or most reasonable of the possible alternative methods of performance that the promisor could have elected, but instead is the "least valuable," or least costly to the promisor, of the possible alternative performances:

> The damages to which the promisee would be entitled in case of breach of such a promise would be based on the least valuable of the alternative performances. . . . A promise to give any one of a thousand specified things as the promisor may choose, though it cannot be enforced specifically, is not too indefinite to have a clear meaning, and the promisee's damages would be the value of the least valuable of the one thousand things. The same is true of a promise to perform whenever within a specified period of time the promisor may choose.

1 R. Lord, Williston on Contracts § 4:24, at 557-58 (4th ed. 1990) (emphasis added). The Restatement of Contracts succinctly defines this rule as follows:

> The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election,

> in accordance with the alternative that will result in the smallest recovery.

Restatement of Contracts § 344, at 565 (1932) (emphasis added); see Koby v. United States, 53 Fed. Cl. 493, 501 (2002) ("general rule is that, unless the contract specifically preserved the right of election for the promisee, 'in the case of breach without an election (of alternatives), [damages] (shall be) in accordance with the alternative that will result in the smallest recovery'" (quoting In the Matter of Community Med. Ctr., 623 F.2d 864, 867-68 (3d Cir. 1980)) (brackets and parentheses in original); Branhill Realty, 60 F.2d at 923 ("[w]here a promisor has agreed to alternative performances, in case of breach without an election, the damages are measured by the alternative that will result in the smallest recovery"); 11 W. Jaeger, supra, § 1407, at 593 (where "no choice has been made" between the various alterative methods of performance, "either expressly by the promisor or automatically by the terms of the contract or by law, the measure of damages . . . is the value of the alternative least onerous to the defendant" (emphasis added)); see also White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("damages for breach of contract shall place the wronged party in as good a position," but not a better position, "as it would have been in, had the breaching party fully performed its obligation" (emphasis added)).[5]

"The *ratio dicendi* for this rule is that the court may not place the promisee in a better position than had the contract been performed – it presumes that the promisor had bargained for

---

5/ "An inconsistent and, it seems, erroneous rule has been laid down in a few cases which hold that if the promisor fails to make an election the promisee thereupon has the option." 11 W. Jaeger, supra, § 1407, at 594. However, this minority view is incorrect. Id.; see Community Med. Cntr., 623 F.2d at 868 (explaining that minority view "has garnered scholarly approval in only one situation – where the contract itself contains language granting the promisee the right to elect remedies"). Any grant of election of remedies to the utility plaintiffs would eliminate the discretion that the Standard Contract grants to DOE.

the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen." Koby, 53 Fed. Cl. at 501; see Liberty Bank v. Talman Home Mortgage Corp., 877 F.2d 400, 407 n.10 (5th Cir. 1989) ("[t]he rationale for this rule is simply: the promisor is held liable only for the cost of the least expensive alternative he could have chosen 'as a recognition of the flexibility which had been bargained for by the party in breach'"). To the extent that the Court determines that acceptance schedules have not already been defined through DCSs and that it must define the appropriate manner in which acceptance schedules, for purposes of evaluating plaintiffs' damages claims, should be identified, the Court must identify schedules that account for DOE's flexibility, absent an agreement to a particular DCS, to have selected among numerous SNF and HLW acceptance scenarios and apply the rule of alternative contracts that any plaintiff's damages for DOE's failure to accept SNF and/or HLW must be based upon "the value of the alternative least onerous to the defendant." 11 W. Jaeger, supra, § 1407, at 593.

In this case, the Standard Contract provides a specific mechanism for defining the schedule of SNF acceptance, requiring the contract holder to submit DCSs and Final Delivery Schedules ("FDSs") if it wants to define specific acceptance rights, the Government's review of those DCSs and FDSs, the Government's eventual identification of a proposed schedule if it does not approve of the contract holder's request, and the contract holder's right, following efforts at further negotiation after DOE's identification of the amount of SNF to be accepted under the DCS, to challenge DOE's proposal at the EBCA. 10 C.F.R. §§ 961.11, Arts. V.B & XVI.A. If the process proceeds to the stage in which DOE identifies the DCS or FDS amount to the contract holder, that selection is subject to review by the EBCA only for abuse of discretion. See

10 C.F.R. § 961.11, Art. XVI.A; see also Reservation Ranch v. United States, 39 Fed. Cl. 696, 714 (1997) ("when the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews that determination to ascertain whether that discretion was arbitrarily or capriciously exercised"), aff'd, 217 F.3d 850 (Fed. Cir. 1999). Because the Standard Contract provides DOE with broad discretion in determining the acceptance schedule for the Standard Contract, the acceptance schedule mechanism is essentially an "alternative contract" provision, and this Court cannot determine a "reasonable" schedule, substituting its views for the agency's, but instead can, at best, identify the minimum schedule under which DOE could have accepted SNF without breaching the Standard Contract. Because the Standard Contract does not contain any performance standards or requirements, other than a start date for the acceptance of SNF, DOE's discretion in identifying an acceptance schedule is extremely broad, including the right to select a slow rate of SNF acceptance. Here, to the extent that the Court finds it necessary to decide the rate of SNF acceptance applicable to this contract, it would need to identify a minimal mandatory rate. Since OPPD has presented no evidence to support any findings regarding that rate, it has failed to satisfy its burden of proof.

## III. WITH ALL DUE RESPECT, SOME OF THE COURT DECISIONS ISSUED SINCE THE GOVERNMENT FILED ITS MOTION REGARDING THE SPENT NUCLEAR FUEL ACCEPTANCE RATE INCORRECTLY ANALYZE THE STANDARD CONTRACT SCHEDULE PROVISIONS

As the Court is aware, since the Government filed its motion for partial summary judgment regarding the rate of SNF acceptance, this Court has issued several decisions, both published and unpublished, regarding our motions in the cases in which they were issued.

In a recent published decision, the Court agreed with the Government that the Standard Contract does not create the two-part requirement regarding the mandatory rate of SNF acceptance that OPPD and other SNF plaintiffs have proposed. In Florida Power & Light Co. v. United States, No. 98-483C (Fed. Cl. Jan. 31, 2005), the Court recognized that "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Slip op. at 22-23 n.12. Similarly, this Court should reject OPPD's identical argument that the Standard Contract obligates DOE to accept SNF at a rate sufficient to eliminate additional at-reactor storage and to reduce the backlog of SNF.

In another case, the Court analyzed the acceptance schedule provisions in the Standard Contract and issued a decision applying them in the manner that the Government has established is appropriate. In Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), this Court explained the manner in which the DCS and FDS provisions were intended to function. The Court in Tennessee Valley stated that the DCS mechanism determines "the earliest scheduled pickup of [plaintiff's] SNF." Tennessee Valley, 60 Fed Cl. at 674. The Court stated in the circumstances of that case that, although the Government generally breached the Standard Contract with respect to the nuclear utility industry by failing to begin acceptance of the utilities' SNF on January 31, 1998, that breach did not apply to each and every nuclear utility because the DCS mechanism in the Standard Contract determined the earliest date that DOE was obligated to accept a particular utility's SNF, explaining as follows:

> TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's

> submission of its first proposed DCS. *See* Standard Contract Art. V.B.1. TVA submitted its first proposed DCS . . . in April of 1997. Consequently, the earliest scheduled pickup of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Id. at 674. Although the Court limited the application of its Tennessee Valley decision, accepting "only for the purposes of [that] case that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract," id. at 671 n.7, the rationale supporting that decision should apply here.[6]

Although the Court has disagreed with TVA and Florida Power in other decisions that it has issued, the Court's decisions in those other cases, with all due respect, do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract. The Court's decision in Commonwealth Edison Co. v. United States, 57 Fed. Cl. 88 (2003), the rationale of which Senior Judge Merow adopted in unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), and other SNF cases assigned to him, rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide the mechanism for determining the SNF acceptance schedule. Yet, the Court did not explain – from a practical standpoint – the manner in which SNF acceptance would, or will, work absent reference to that schedule mechanism. Finding that the delivery commitment schedule ("DCS") process did not limit the contract holder's damages or limit its right to the acceptance of larger

---

[6] In an unpublished order in Power Authority of the State of New York v. United States, No. 00-703C (Fed. Cl. Sept. 30, 2004), the Court found that the issue implicated by the Government's motion for partial summary judgment upon the rate of SNF acceptance, as well as the plaintiff's cross-motion for summary judgment regarding the rate, "is a fact-laden inquiry that the Court finds does not lend itself to resolution on summary judgment." Order, at 1 (Sept. 30, 2004). Accordingly, the Court in Power Authority denied both parties' motions regarding the rate.

amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Id. at 663. Yet, the Court did not explain the manner in which SNF acceptance could practically operate under the Standard Contract without reference to the DCS process: specifically, without the DCS process, the Standard Contract contains no requirement that the contract holder notify the Department of Energy ("DOE") of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court fails to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, as discussed in our motion for partial summary judgment, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform. As we establish in our motion, the Court should find that the DCS provisions in the Standard Contract have meaning and, given that they provide the sole

means of establishing workable and practical SNF acceptance schedules, provide the basis for establishing the acceptance schedule for use in establishing damages in this case.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), appeal pending, No. 04-5122 (Fed. Cir.), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance pursuant that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by

DOE that it was contractually binding itself to such an obligation. In fact, as discussed in our motion, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to place any such requirement in the Standard Contract. Further, the Indiana Michigan Court's finding that a "3,000-ton annual rate of delivery" is a reasonable term simply to insert into the Standard Contract has no basis and, in any event, cannot be done in a summary judgment proceeding. Not only does it ignore the DCS process and the agreements that DOE and numerous utilities had already made, it creates a contract to which the parties had never agreed.

In fact, the trial court's decisions in ComEd and Indiana Michigan eliminate the existing schedule terms from the Standard Contract, leaving the Standard Contract with no mechanism for determining when, how, or where DOE will accept SNF and/or HLW or for allowing DOE, assuming that SNF acceptance had timely begun, to identify the SNF that it would need to accept, the dates on which it would need to accept it, and the locations at which it would need to accept. In essence, the Court's decisions have rendered the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

The Court of Claims has previously observed that, "[n]ormally, the task of supplying a missing, but essential, term (for an agreement otherwise sufficiently specific to be enforceable) is the function of the court." David Nassif Assocs. v. United States, 214 Ct. Cl. 407, 423, 557 F.2d 249, 258 (1977). However, the limitation upon the Court's ability to supply its own term is clearly stated: "for an agreement otherwise sufficiently specific to be enforceable." Id. Here, the trial court in the ComEd, Indiana, and Yankee cases has eliminated the contract's own schedule mechanism and substituted, or will have a trial through which it intends to substitute, a schedule

term that the Court thinks would be reasonable. Yet, the acceptance schedule that the Court in Indiana Michigan selected for the contract is not based upon any information or language in the contract itself. To the contrary, the Court dismissed any reliance upon the agreements regarding schedule that the parties had already made, as identified in approved DCSs. Instead, the Court simply inserted its own term into the Standard Contract.

A court cannot make contracts for the parties. To be valid and enforceable, "a contract must have both consideration to ensure mutuality of obligation . . . and sufficient definiteness so as to 'provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" Ridge Runner Forestry v. Veneman, 28 F.3d 1058, 1061 (Fed. Cir. 2002) (citations omitted). If an agreement is missing one or more essential terms, an agreement to agree on those terms is unenforceable because it lacks mutuality of intent and sufficient definiteness to determine the rights and liabilities of the parties. See Modern Sys. Tech. Corp. v. United States, 979 F.2d 200, 204 (Fed. Cir. 1992); Bel Pre Health Care Center, Inc. v. United States, 24 Cl. Ct. 495, 496 (1991) ("[i]f an essential term, such as the quantity term, has been omitted then there can be no basis for deciding whether the agreement has been broken; the definiteness necessary for enforceability is lacking"), aff'd, 980 F.2d 745 (Fed. Cir. 1992) (table); Transamerica Equip. Leasing Corp. v. Union Bank, 426 F.2d 273, 274 (9th Cir. 1970) ("[w]here an agreement is not sufficiently definite to enable a court to give it an exact meaning or where an essential element is reserved for future agreement of both parties, a legal obligation cannot result"). "Courts refuse to enforce agreements that contain indefinite promises or terms they deem essential because judicial clarification of the uncertainty entails great danger of creating intentions and expectations that the parties themselves never entertained." Neeley v. Bankers Trust Co. of Tex., 757 F.2d 621,

628-29 (5th Cir. 1985); see Mays v. Trump Indiana, Inc., 255 F.3d 351, 357-58 (7th Cir. 2001) ("mere agreement to agree does not a binding contract make" without agreement on "all essential terms that are to be incorporated in the document"); Shann v. Dunk, 84 F.3d 73, 78-81 (2d Cir. 1996) ("[w]e believe the issue of Shann's liability for the deferred payments was of such importance that, if the district court finds the parties failed to agree on it, the court would be required to void the contract for absence of an essential term").

Obviously, as indicated in the Court of Claims' decision in Nassif, certain terms of a contract that are "essential" to it in some respects may, in certain circumstances, be identified by the Court, which must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . . ." David Nassif, 214 Ct. Cl. at 376, 644 F.2d at 7. However, at a certain point, the missing term becomes so essential to the formation of the contract that the Court, if it supplies the missing term itself, creates a contract to which the parties had never agreed. In Nassif, even though the cafeteria that the plaintiff was to build may have been an "essential" part of the contract, it was not the central part of the contract, which, instead, was a 20-year lease of floor space in an office building. Here, the "missing" term that the plaintiff seeks to have the Court impose into the Standard Contract is one of the central aspects of the Standard Contract and will have an extraordinary effect upon the damages that the plaintiff could recover from the Government here. Depending upon the rate and schedule of SNF acceptance that the Court imposes into the Standard Contract, the damages in all of the pending SNF cases could vary from a very small amount of damages to, as alleged by plaintiffs, billions of dollars. This enormous variance in the effect of the acceptance schedule term upon the parties' rights, obligations, and damages cannot be said to be minor and, in fact, is one of the most essential

terms of the Standard Contract. To the extent that the Court disagrees with the Government's arguments that the schedule provisions of the Standard Contract and the approved DCSs identify the parties' obligations in this case, the Court cannot merely impose its own view of what a reasonable schedule term should be. A rejection of the Government's schedule arguments would effectively render the Standard Contract too indefinite to enforce. See Massengill v. Guardian Mgt. Co., 19 F.3d 196, 202 (5th Cir. 1994) ("When a writing does not show the parties' agreement on a minor contract term, the reviewing court may supply a reasonable interpretation. . . . *But essential contract terms may not be supplied by a court*. 'If any essential term is left unresolved, there is simply no contract and no obligation on the parties.'" (emphasis added; citation omitted; applying Mississippi law)); see also Coyle's Pest Control, Inc. v. Cuomo, 154 F.3d 1302, 1306 (Fed. Cir. 1998) (refusing to read "reasonable" term into contract, court found contract unenforceable as indefinite quantity contract because it lacked minimum quantity term).[7]

As we have established in our motion for partial summary judgment regarding the rate of SNF acceptance, the Standard Contract provides a mechanism for establishing the SNF acceptance schedule, including the rate of SNF acceptance. The parties followed that mechanism for a significant period of time. Further, the Department of Energy published its Acceptance

---

7/ It is true that the appellate court has found that a contract term which allows for future negotiation "impliedly places an obligation on the parties to negotiate in good faith," Aviation Contractor Employees, Inc. v. United States, 945 F.2d 1568, 1572 (Fed. Cir. 1991), and that, where the contract and applicable regulations provide guidelines for negotiations of future agreements, the Court may "determine whether or not the government negotiated according to the contract." City of Tacoma, Dep't of Public Utilities v. United States, 31 F.3d 1130, 1132 (Fed. Cir. 1994). However, that review does not empower the Court to create a contract for the parties where the "missing" terms are so essential to the central purpose of the contract that the absence of the terms renders the contract too indefinite to enforce.

Priority Ranking and Annual Capacity Report, which identified the acceptance schedule for the first ten years of contract performance. As a result, a schedule exists that the Court should view as the contractual "schedule" for purposes of assessing damages. Absent the Court's reliance upon that prior schedule, we cannot identify any basis for the Court to impose its own schedule into this contract.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant the Government's motion for partial summary judgment regarding the rate of SNF acceptance.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
FAX: (202) 307-2503

OF COUNSEL

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

February 1, 2005

Attorneys for Defendant